Judge Logan
delivered the opinion of the court.
The appellees exhibited their bill to coerce from the appellant the title at law to certain land, to which they al-ledge the superior right derived under the pre-emption, of Benjamin Casey, which was granted by the court of commissioners on the 22d of April, 1780, on account of marking and improving the same in the year 1776, containing the following location, viz: “Lying on the second buffaloe ^crossing on the middle creek of Stoner’s fork of Licking, ’•to include his improvement.”
An entry catlingto“lic sing on the fort 0f Lick-⅜⅛>include imProve-⅛0> ti,e creek was tye 0f Sirodc’s cr’k. j.1 beintf in freek^Sto-ner, & known by that name t0 a fe’v‘
*260 By virtue of which, the heirs of Casey procured a pre emtion warrant, and,on the 27th of February, 1783, entered a 1000 acres with the surveyor, corresponding with the location in the certificate of the commissioners.
Whether this is a gúocl entry, is the first and principal question for the determination of 1 he court in this cause, In order to a correct understanding of this entry, it will be proper to bear in mind the following facts.
1. That Stoner’s fork of Licking is about 25 or 30 miles long, having many tributary streams putting in on both sides, with Buffaloe crossings passing up and down theta, at the period this entry was made.
2. That neither of these streams was generally known by the name of the middle creek of Stoner’s fork. Nor was the improvement known generally as Benjamin Casey’s improvement, although!, it is proved and identified.
3. That the creek yeas generally known by the name of Stroude’s creek, in consequence of his having erected a station on it in the fall' of the year 1779. That it had been known by different names: many knew it by the name of the middle creek of Stoner’s fork; but most of those persons who knew it by that name, had settled more distantly from it, than others who resided iu the nearer stations, and knew it not by that name.
4. That it is iarge^.and was generally and well known. That a buffaloe road heading from Boonsborough to Har-rod’s lick, and thence to the Lower Blue lick, passed down it, and crossing frequently within a few miles of each crossing; which place obtained, and ivas generally known by, the appellation of the many crossings.
5. That the creek is, in fact, a middle fork of Stoner; and it seems, would, from the description in the entry, have been understood as the creek intended, by those who possessed a general knowledge of that section of the country and its waters.
G. That there were many improvements on those waters, though but few of them, designated or described with certainty in this contest. That Casey’s improvement was mear the road, about 50 poles from that crossing of the creek, which is represented as the second cjpssing going from the settlements to the exterior of the country.
From these premises it remains to enquire, 1st. Whether this entry would have directed subsequent locators, with sufficient certainty,-to the creek in question? 2dly. What *261 «(feet'has the call for the second buffaloe crossing on the creek? And 3dly. As to the effect of the call to include _ # 9 ⅛- ■ his improvement?
From the description in the entry, it seems that the witnesses who were acquainted on the waters of Stoner’s fork, would have understood Ibis creek to be the one intended, But it is contended, that this is referring to the opinion of witnesses what is matter of law, and proper only for the termination of the court. It is true that it belongs to the court to decide upon the effect and legal operation of an entry. And the description contained in an entry, whether it is sufficiently certain and precise, is a question of law proper for the determination of the court.
! Yet the aptitude of objects to the description given is in pais, rests in the knowledge of individuals, and can only be detailed in evidence. Whether, therefore, there exists an object answering the description of an entry, is first, with regard to its existence, but matter of fact • and next-, as to its sufficiency and legal effect, matter of law.
The reason and object pf the law in requiring precise description in an entry, is well understood to be, that others may know what land is thereby appropriated. The call for a creek, or other object of description, is intended to give notice to others, and to conduct the mind, with reasonable certainty, to a definite spot. If, therefore, the creek or object would, from the description given, be generally understood by those possessing a knowledge of the situation of the country around, the'meaning of the iaw, and the object of description,'would be fulfilled. It argues strongly, when those acquainted with the existence and situation of objects specified in an entry, unite in the selection of one place, that the description is good. The same description may be. good and bad in different entries, when applied to distinct water courses. As for example, a call for the middle fork of Licking, or of any stream having three large and well known forks, may be a good call of general description. Whereas, a call for the middle creek of a stream not having principal and distinguishing forks, hut presenting many forks nearly equal in size, could but perplex and confound the most diligent enquiries.
Whether the creek referred to in the entry under examination, falls within oneyor the other of the two instances put, forms a material part of the subject of this discussion. The witnesses speak of it as a creek which might, with *262 propriety, be called the middle creek of Stoner, as ⅜ largs and principal fork; its size and situation in conjunction with a road, which served as the common high way from stations to distant licks of general resort and great notoriety, necessarily attracted notice and excited inquiry. From these circumstances, several of them say, that although they knew it not by the name of the middle creek, they would have concurred in the understanding that this wap the creek intended.
The road and improvement gave strength to the call for the middle creek. The second crossing, and the improvement on the middle creek, elicited the attention and put to inquiry the three objects. Those conversant in that part of thq country would have answered, that this creek was large, and situated between the main prong of Stoner and Huston, a creek of Stoner of considerable size; that there were many other creeks, though relatively small; that of all the intermediate streams and other waters of Stoner, this middle fork was much the most travelled; the leading road from Boonshorough, Stroude’s station and other settlements, to distant licks and places of notoriety, passed down it, crossed it frequently, and led on to the great high way to and from the country by the Lower Bine lick; and that there was an improvement situated near this road, not far from the second crossing of the creek.
But opposed to any satisfactory conclusion from this information, the inquirer might have learnt, that there were many creeks mouthing into Stoner, with huffaloe roads and improvements upon them, though these creeks were smaller, less visited, and not so well known; and the roads were not general, but more local, and seemed rather as feeding and watering paths of the neighboring beasts, than as leading, general roads, communicating with distant places of general resort.
Had these creeks and roads been pointed out with cer-? tainty, perhaps the comparison would have produced no difficulty upon the probable certainty of those intended: and every inference which can be fairly indulged against the vitiating effect of absent objects, not specially designated, and but loosely and vaguely mentioned, ought to be made in favor of the entry. Had the creek and road been named, probably an improvement, situated near a second crossing, would have been wanting. And without a probable unity of the several calls, the presumption is violent, thst *263 the subsequent locator would not have doubted, neither ought he, as to the creek intended. • It is true were there any other creek, road, and improvement shewn, which could produce a well founded doubt as to those intended, the entry ought not to be sustained. But the mere circumstance of there being other creeks, roads and improvements, comparatively obscure, and less the subject of conversation — neither calculated to arrest the attention, or embarrass and bewilder the mind in competition with those which at first view presented to the people possessing a knowledge of the country — ought not to be too hastily received as destructive to a claim of land; because it would give a preponderency to ingenuity and nice critical objections founded in literal expression, to the first striking impression of the country in relation to matters in pais.
It is sufficient that an entry contains a description which is certain to á common and reasonable intent. From such k description Subsequent locators could, by a liberal and fair construction, collect the probable meaning of the locator as to the place intended. A just regard to the state of things and situation of objects at the time of making the éntry, would often obviate objections to description, at this day apparently equivocal and uncertain, which then was satisfactorily understood with reference to particular objects that had attracted notice, were in common use, well known and most likely to be thought of only when named, although others should have existed, but less known, scarcely spoken of, beyond the reach of probable expectation, and very probably not once thought of either by the locator or those perusing his entry.
A buffaloe road leading from Boonsborough on the Kentucky river, across the country to the Lower Blue lick, usu - ally travelled by people — passing down a main creek of Stoner’s fork- — a creek on which a station was erected, crossing it frequently, which had occasionally changed its name according to particular circumstances, but was by nature a middle creek. And can it be believed, that the people of Boonsborough,. of Stroude’s station, of M’Gee’s station, possessing a knowledge of these things, would have hesitated as to the meaning of the locator between this road and creek, and what other road and creek, it may be asked? Was it any creek that can be conceived of? any road, even without a place of departure, and no place of destination; a mere wandering, lost path of the buffaloe? It is difficult *264 for the mind to assent to the affirmative of such a pro,pos¡' ¡ And we proceed to examine the next call of the entry, for the second buffaloe crossing on the middle creek of Stoner’s fork.
“The ,2nd Buffiioecros-there are many, must be construed to condcrostino-%-bich a ir", tler would ?n^’ ^ the'nE settle^ ment to the extenor.
The cross-,r^t!vecallm ihb euti-y; it is to be centered vatu ^ordinal * ½ points, if the improvement ⅛!\ ⅛”that way.
There are five crossings delineated;, so that the conse-quenco, is, that a different place would be designated accordingly as we descend or ascend the creek. . The witnesses generally unite in the statement, that the place claimed for en^r7’ would have been pointed out as the second crossing; because it was so in going from the stations and settlements of the country. and from the office of entries. This is the natural, order in the computation of the cross-¡ngs. They would be reckoned as they occurred in departing from the settlements.. Such, it is believed, would have becn the common understanding, and we think it should be received in this respect as the proper rale of construing this entry.
We come now to consider the. last call in this entry for the improvement of Benjamin Casey.
This improvement is proved, though the witnesses do not identify with certainty the precise spot where it stood: They point out within a few poles of where it was. But others speak of another improvement near that, and which was situated nearer to the crossing of the creek. This evidence, to a certain extent, would effect the entry, if the improvement, ought to be regarded as (he central and anchoring point of the claim. But if it should not be so considered^ then, it will be immaterial, whether one or the other of the two improvements, or both, are taken as regulating the figure and position of the claim.
To lie on the second Buffaloe crossing on the creek, and 'nc^u(^e h<s improvement. The crossing on the creek *s evidently a. locative call, and seems intended as the pivot of the entry with regard to the manner of laying it down, j(- js not c|0ubted, however, that the locator intended to inc'l,l^e his improvement, because his entry calls to do so, and because the dignity of his claim depended on it. But he was not necessarily bound to make it the centre of his sur-ve7- Any expression, evincing an intention to place his claim differently, is certainly entitled to its full extent, and fair import. And the improvements being near the crossing of the creek, would not only be comprehended, by placing the entry there, but would seem as not expected to vary its position; so that the lines of the survey shoud be ex *265 tended to the cardinal points, including the crossing of the creek in the centre of a square; especially, as in this case the improvements are almost precisely in that direction from the crossing.
Hardin and Bibb for appellant; Pope, Talboi and Wick-life for appellee.
The counsel for the apppellant
presented the following petition to the court:-—

To the honorable the Judges of the Court of jUppeclts.

The counsel for the appellant making declaration of their respect for the opinions of this court not superinduced so to do by the hollow forms of judicial proceedings, but in candor and sincerity, would nevertheless ask of this court to review the decision given in this cause.
An entry upon a pre-emption for marking and improving has been established as valid by this decision, which the counsel most respectfully insist is an entry vague and uncertain when tested by the settled rules which have been heretofore recognized.in this court. The entry is as follows:
"21th February, 1783. The heirs of Benjamin Casey “enter í 000 acres on a pre-emption warrant, &c. oh the “■second buffaloe crossing, on the middle creek of Stoner’s “fork of Licking, to include his improvements
These facts are proved beyond doubt; thaftbe creek assumed was generally and notoriously called Stroude’s creek from the winter of 1779.
That it had many tributary creeks, as the witnesses say, too numerous to mention.
That neither of these creeks had acquired the name or the reputation oí the middle creek. That Stoner was 25 or 30 miles in length.
That the trace assumed as making the crossing, was generally, nay, universally, called and known by the name of the hunter’s, or salt spring trace, from Boonsborough to the Lower Blue licks.
As neither Stroude’s creek, the salt spring trace, nor Boonsborough, nor the lower Blue licks, nor the trace leading to those places, are alluded to by name, these omission! are defects in the entry according to repeated adjudications, The omission of all these names (if the place at which the survey was made was intended,) was calculated to mislead, perplex and beivilder. The expression of “i'xe middle creek, ’ an appellation known only to a single company of explorers, several oí whom swear they only heard Williams call some creek so, without knowing which creek, was calculated to induce all who knew Stroude’s creek, to believe Stroude’s creek was not intended, but some other of the numerous creeks putting into Stoner, up and down which there were buffaloe roads passing, and often crossing, as the witnesses depose.
*265 As this manner of laying down the claim varies from that pursued by the court below, and as it appears that it will not give the appellees all the land decreed to them by that court; for so much, therefore, as is decreed contrary to this opinion, the decree must be reversed with‘cost, and affirmed as to the residue.
The expression “middle creek,” not even described by the proportional term of fork, was calculated to make the impression on others, that the creek intended by the locator was not Stroude’s, hut some other of inferior size, to which public attention had not been so attracted as to give it a name. The correct argument is, that Slroude’s creek was not intended, otherwise it would have been called for by its appropriate name. This is the essence of the principle decided in Helm’s heirs vs. Craig, Hard. 112; Respcss vs, Arnold, Hard. 113; Couchman vs. Thomas, Hard. 261; Craig vs. Doran, &c. Hard. 142.
The same argument applies with respect to the omission ⅛ call for the salt spring trace, and the many crossings, names well known and applied to the trace and crossings, now assumed by the holders of this entry.
'This omission, according to settled principles, is fatally defective, unless the entry contains some other description, which would have led others to the place intended, and assured them also of its identity. This substitute ought to have been as easy of access to the enquirer,, and as certainly descriptive and identifying as the omitted names of Stroude’s creek, the hunters trace, &c.
The substitutes offered are — i; “the middle creek” — 2; “the second buffaloe crossing,” — 3; “Benjamin Casey’s improvement.”
As to middle creek as a name, the counsel most respect-' fully insist, that the evidence does not warrant the fact assumed in the opinion, that this creek, now claimed for the middle creek, ever was known to umany” by such name, David Williams, Nathaniel Randolph and William Ray-bourn, are the only witnesses who knew it by that name. David Williams and Randolph called it by that name in 1778, but left the country shortly afterwards, and when they returned, never resided nearer than Harrodsburg: it was not known by that name at Harrodsburg, as Williams himself swears; (p, 44-45) — it was not so known or called at any of the nearest stations. Randolph swears that his company knew it by that name in 1776 — his company consisting of five or seven persons at most; and Soduskie and Shanklin, .two of that company, swear they did not know the creek that Williams called by that name, they only heard same creek called so: The testimony of nine exr press negative witnesses, added to Soduskie and Shanklin^ countervail, most certainly, the idea that the creek was ever generally known as middle creek, or that it was known to many. Vide Harrison vs. Deremiah, 2 Bibb, 219.
As to middle creek as descriptive of Stroude’s creek, it is respectfully urged by the counsel, that such description does not apply with any reasonable certainty to Stroude’s creek: the creeks putting into Stoner’s fork are declared, byja croud of witnesses, whose testimony is unimpeachable and uncontradicted, to be numerous on each side. The witnesses do not say it was a characteristic distinguishing description. They say it might be called a middle creek; and this response is produced by connecting with this description the idea of tbesaZi spring or hunters trace, from Boonsborougb to the lower Blue licks, as contradistinguish-ed from the other buffaloe roads which crossed the “crce&s” putting into Stoner — and bv such interposition of words, not used in the entry, excluding from the mind many of the streams which the salt spring trace did not cross.
But, from the whole testimony, it clearly appears, that Stroude’s creek was not certainly described as “the middle creek:” — all that can be asserted is, that the description was not positively and wholly fake — but it was far from being truly and certainly an identification,of Stroude’s creek to the exclusion of every other; to say that 9 was a middle number between 3 and 12, would not be positively false; but the middle number between 3 and 12 would not certainly lead to the number 9.
Again, this description could never have led the enquirer to Stroude’s creek with the same, facility that the name Stroude’s creek would have done. The process of enquiry - to find what was intended by “the middle creek,” was more tedious, laborious and equivocal, than that of finding Strouds's creek,
“The second buffaloe crossing” docs net convey to the mind the idea that it is made by the continuity of the same buffaloe road. Two roads leading to and from different places,⅜ both crossing the same creek, fits the expression as well as two crossings by the same road: and those who knew “the. many crossings” on Stroude’s creek would not have supposed any one of those was intended in an entry, when the many crossings, so well arid generally known, were not called for by name.
The counsel would respectfully insist that the aptitude of the expression uthc middle creek” to this or that creek of Stoner’s fork, is a matter of law to be decided by the court; the existence of the creeks is a fact to be proved by evidence. Whether, when the creeks are proved, the expression here used not as name by reputation, but as description, fits these or any other creeks, is matter of deduction, not matter of fact; it is a deduction from facts instead of the facts.
There are five crossings of the salt spring trace proved, and so stated in the opinion of the court. The entry gives no clue by which the second crossing is to be ascertained, whether by beginning to count from the mouth or from the head of the creek — the court have taken the count from the head, because it was the first in “departing from the settlements.” The counsel most respectfully desire a review of this position taken m the decision given. To those who travelled from Boónsborougb to the lower Blue licks, it might h.ave been the order of counting: but the office was kept, at Lexington; Bryant’s station was also nearer to Sto-ner; — from Lexington, Bryant's, Beargrass, Harrodsburg, and various other stations, by Boonsborough or Stroude’s, would not be the rout which an explorer would have taken to search for Stoner and “the middle creek of Stoner.” From Lexington and Bryant’s station a trace to the lower Blue licks crossed Stoner; this also was called the salt spring trace — it was a great and general high way which was travelled by thousands in coming to the country; it was pursued by a great portion of the army w^R&ajght the celebrated battle of the Blue licks. An expfes^ who happened to set out from' any other station than Boonsborough or SU'oude’s, to search for the locality of this entry, would more probably have gone to the mouth of Stoner, followed it up to ascertain its creeks, and then the rcckv ford would have been the first crossing on Stroude’s creek. This was the rout actually followed by Williams and company when they made the improvements on Stroude’s creek. (See Nath. Randolph dep. p. 55.) It appears by the depositions of many of the witnesses, that the rocky ford was the first crossing which they found in exploring Stroude’s creek— (see Joshua Stamper, p. 28:) — he says rocky ford was the first, and that shewed by Randolph, the last of the many crossings — (see Oswd. Towns, p 37) David Williams says the rocky ford was the first crossing — (p. 44 — 5.)
It is respectfully suggested, that the second crossing is, at best, a very equivocal expression in the entry — for whether an explorer would have counted the one contended for by the holders of Casey’s entry, as the second or the fourth, would hgve depended on chance, and the probability is the greater, that using the means of enquiry afforded by the entry, it would have been the fourth w’hicli was found in his search.
As to Ben. Casey’s improvement, it must be acknowledged it had no notoriety — it was not known as his at Stroude’s station, only six miles from the place claimed — it never yvas generally known — it had no characteristic to distinguish jt from any one of the. other improvements, made at each of the crossings by the same company, or from the other improvements made on the same stream by others— all of which other improvements, to (he number of seven, are as well identified as the one claimed- — and the witnesses conversant in that quarter of the country, and those residing at Stroude’s station, declare they knew not to whom any of those improvements belonged. The existence of this improvement, in spring 1780, is not proved, much less is there any evidence of its existence in 1783. The improvement claimed w'as not made by Ben. Casey — be mv ver was in the country' — he never contributed to the de-fence of the country — he was in Virginia — Williams made it for him; — he never saw' it — he w'as not known in the country as having an existence, except to three or.four persons. The claim is the offspring of fraud, begotten in concealment and nurtured in obscurity. - '
In the opinion rendered by the court, not being able to give any strength to the claim, on account of the want of notoriety of Casey’s improvement, the court have made the second crossing the only governing call, and have contented themselves with the fact, that the place sworn to as intend ed by Williams fó'r Ben. Casey’s improvement, will be in7 chided by centering the crossing — thus making the call for' the improvement inoperative, it is respectfully suggested that any locator has, a right to insist that any one of the many improvements in the vicinity, which can be included, together with the crossing, in a reasonable iiguffe, shall be taken, which will operate least to the injury of the conflicting claim — and that the improvement of Johnson, o& at the last crossing towards the head, or any other; thereabouts, ought to govern the figure of the survey. By the opinion of the court, ttie survey is directed precisely as it would have been, if the call for the improvemuet had been omitted — whereas,according to settled principles, the counsel humbly suggest, the call for the improvement is a governing call, and by reason of the number of improvements in the vicinity, and the want of distinction between them, the entry is therefore void. See Horn beck vs. Stansberry, 2 Bibb; 476; Mercer vs. Quin, 478; Walker vs. Montgomery, 2 do. 259; M’Gee vs. Thompson, 1 do, 136 — 7; Worley vs. Bruce, 2 do. 106; Grubbs vs. Rice, 109; Buckner vs, Fagans, 138.
The counsel respectfully insist, that according to the evidence in the cause, compared with the expressions in the entry, and tested by the rules of decision as heretofore we!! settled, this entry ought to be declared void for uncertainty. That the nearest parallel to the decision pronounced byjkfs"court, in sustaining this entry, is that of Old-ham vs. Carter — a decision from which Judge Wallace dissented, and has often expressed his regret, (to one of tb# counsel, tyho had the honor of being afterwards associated with him im the bench,) that his dissent was not spread upon the record — a decision which, the judges who gave it, never afterwards thought worthy to be followed as a precedent — which has been overruled again and again, and ''became a bye-tsord with judges and lawyers.
* The counsel most respectfully insist, that there is nothing to uphold this entry, but the mere proof, that this was the place intended by Williams, the locator — which intention is not embodied in the record of 1he entry — and such a doctrine is irreconcilable with the rules of property, as firmly .settled by the decisions of this'court. '
Etmánum- cst errare: herd judiéis cst ccrpgere errorem,*. The wisest will sometimes err: Happy is lie who perceives Ms error, before it is too late to correct it.
A rehearing of the cause is most respectfully asked.
BIBB & HARDIN.
The cause came on to be reargued at the Spring Term, 1818, when the court overruled the petition, and ordered the opinion to remain unaltered and affirmed.